## LINDBERG ENGINEERING CO. v. AJAX ENGINEERING CORP.

### No. 10588.

United States Court of Appeals
Seventh Circuit.

Nov. 19, 1952.

James P. Hume and Howard W. Clement, Chicago, Ill., Joseph Gray Jackson and Edward Lovett Jackson, Philadelphia, Pa., for appellant.

Will Freeman and George E. Frost, Chicago, Ill., Edwin S. Booth, Chicago, Ill., for appellee.

Before KERNER, FINNEGAN and LINDLEY, Circuit Judges.

LINDLEY, Circuit Judge.

Defendant having notified plaintiff that it claimed that the latter was infringing defendant's two patents to Tama, 2,427,817, covering the structure of an induction furnace, and 2,499,540, a method of cleaning metals in such a furnace, plaintiff brought suit seeking a declaratory judgment of invalidity. Defendant counterclaimed, asserting validity of both patents, charging infringement and seeking damages. Both were held invalid for want of invention; Claims 1, 7 and 9 of the structure patent and 3 and 4 of the process patent were adjudged not to be infringed, but the trial court apparently thought that Claim 1 of the process patent, if valid, was infringed. In view of our conclusions, other issues of unfair competition and abuse of monopoly require no consideration on our part.

Originally, to melt aluminum, it was heated in a furnace to a molten degree with a fire. However, in such an operation, only about one-fourth of the heat generated by the burning of fuel is utilized in melting the metal. Furthermore the consumption of fuel frequently produces excessive gases and results in hard spots, aluminum oxide, in the aluminum, with the result that castings formed from metal so melted are likely to be too porous to be suitable for use in such nice applications as in automobile motor pistons and divers airplane parts. To meet the deficiencies of this traditional method, induction furnaces have been

developed and utilized. To a relatively large degree such types avoid the frailties attending the outside heating method, by creating heat within the aluminum itself. In such an apparatus an electric current passes through a coil located outside the metal itself, inducing a separate current within the metal contained in channels adjoining the coil, thus producing the desired heat. The coil, into which the original current enters, is known as the primary, and the metal, itself, into which the induced current flows, as the secondary coil.

In such a furnace there may be one or two chambers, but we shall confine our consideration largely to one of two chambers, as such is the character of defendant's device. Between the two chambers are passages or channels, a primary coil being located between each pair of channels. Each coil surrounds an iron core which extends around the channels. Molten metal is poured into the furnace, until it rises to a level slightly above the upper end of the inclined channels thus providing in the latter and in the chambers a complete loop of molten metal in which the secondary current flows. When electric power is turned on, the current in the primary coil creates a fluctuating magnetic field in the iron core which in turn induces a current in the molten metal loop. Thereby the greater part of energy generated is consumed in heating and melting the metal, in contrast to the relatively small percentage of fuel capable of being utilized in a fuel-fired furnace. Futhermore, the problems of porosity and hard spots are decreased or eliminated and much closer control of the temperature is possible.

In 1916 Wyatt devised such a furnace for melting brass and other copper alloys, which readily found its way into commercial use. It had but a single chamber. The channels through which the molten metal flowed slanted toward one another forming a V. The character of aluminum is such that the problems attending its melting differ from those encountered in heating heavier metals. The dross or oxide of the lighter metal, being heavier than the aluminum itself, drops to the bottom instead of rising to the top, as is the case with heavier metals. This oxide, falling to the bottom of the channels, builds up into hard masses gripping the walls of and eventually completely clogging the channels; hence the necessity of relatively frequent cleaning.

In 1926, Tama tried to melt aluminum instead of brass in the Wyatt furnace, but was not successful. The channels became clogged with oxides, which are not conductors of electric current. Thus, the secondary current became clogged and eventually could no longer flow, as the circuit was broken just as if an electric switch had been turned off. Obviously, it was necessary to keep the channels clean.

Russ, who was apparently the first to build an electric furnace for melting aluminum, about 1935, provided a single chamber furnace which, instead of using Wyatt's V channel employed in his brass furnace, utilized a U shaped channel, in order to clean which it was necessary first to empty the molten metal. Then a flexible chain was inserted into one end of the channel, extended to the other and pulled back and forth. This proved unsatisfactory because the cleaning had to be done hurriedly while the high temperature of some 1300° was maintained; otherwise disastrous results would occur. Tama made a modified Russ furnace, but this, too, had to be emptied in order to clean the channels.

With regard to the method suggested by Tama in his patent in suit for permitting facile cleaning of the channels, defendant in its brief says: " * * * The great advance which Tama made, and which was a decided forward step in this art, was in the provision for cleaning the double chamber electric induction furnace 'wet', that is, without emptying the molten metal * * *." In his patent application Tama said that a difficult problem in the operation of this type of induction furnaces lies in the impurities and slags resulting from the melting procedure, forming in the melting channels, deposits which reduce their working area and eventually clog them entirely. He asserted that it was his object to provide an induction furnace which would allow removal of the impurities while the

channels were filled, without interrupting the operation. Claim 1 is as follows:

"A submerged resistor type induction furnace comprising a plurality of separate hearths having their bottoms at different levels, at least two substantially straight melting channels connecting the bottom section of a hearth having its bottom at a higher level with the bottom section at a lower level, at least one transformer assembly threading the secondary loop formed by the said melting channels, said straight melting channels being inclined at an angle to permit the introduction of cleaning tools from the outside wall of the furnace and above the level of the molten charge."

This and other claims in suit make it clear that the improvement relied upon for patentable invention lay in the fact that the channels could be cleaned while they were full of molten metal. Our question then is whether the finding that Tama's method and structure were fully taught by the prior art is clearly erroneous.

Induction furnaces proper for melting aluminum were well known to the art and it was recognized likewise that the chief difficulty to be avoided was the clogging of the channels through which the molten metal flows, eventually resulting in the stoppage of the electric current through the metal, for various workers in the art had contended with this problem. One, Wyatt, prescribed a V shape channel through which straight cleaning tools were passed; another, Russ, a U shape channel through which a cleaning chain was passed; another, only slightly inclined channels, and still another arcuate channels through which arcuate tools were passed. Tama adopted the straight channels, but tilted them upward to a higher degree so as to avoid tipping the furnace. It would seem obvious from the court's findings and from the evidence in support thereof that there was no patentable invention in the prescription of inclined channels, for they had been disclosed. The specific question below and here, as we understand it, is whether, when Tama provided a method of cleaning the channels, while they were still full of molten metal

without interrupting the process, he did something so new and so advanced as to amount to patentable invention.

The court commented that the patentee, Tama, had testified that the advance over the prior art in both patents lies in the ability to clean channels without interruption for emptying the channels, thus cleaning them with molten metal therein, sometimes called "wet cleaning", and found that such method of cleaning was disclosed in the art by some six printed publications, more than one year prior to the date of the filing of the patents in suit, including particularly the publication of "Metals and Alloys" of February, 1943, and the Swedish patent 109,793 to Essman, both of which were a part of the prior art at the time Tama filed his applications, and that plaintiff modeled its furnace upon one manufactured in Germany by Siemens, which had been fully described in publications more than one year prior to May 24, 1945, the filing date of the earliest Tama patent in suit. The court found further that Siemens employed in his furnace straight, slightly inclined channels, which could be cleaned by passing a tool from outside the furnace through the channels in a straight inclined direction while the furnace was full of molten metal; that, though the furnace may have been cleaned with the channels empty, its construction was such as to make it possible to clean them with the metal still in them.

The court also found that Swedish patent 109,793 to Essman disclosed a two-chamber furnace for melting aluminum in which the chambers are spaced horizontally; that they are connected by arcuate channels, and cleaned by arcuate cleaning tools, which pass through the open top of the charging chamber and through the channels; that, though the text of this patent does not expressly specify whether the channels are to be emptied before cleaning, the structure is obviously adapted for cleaning them while they are full of metal or, in other words, while wet, and that one skilled in the art, with the Swedish disclosure before him, would naturally clean with the channels full.

The court found still further that Tama, more than a year prior to the filing date of

his patents in suit, disclosed, in a printed publication, a single chamber induction furnace identical with the furnace of the patents in suit except that the channels were vertical; that they were cleaned by passing straight tools in a straight direction through them from the outside of the furnace, while the channels were full of molten metal, and that furnaces embracing this teaching were built more than a year prior to the filing date of the patents in suit, in which the channels were cleaned while they were full of molten metal; that these prior art teachings are identical with the cleaning prescription of the patents in suit; that, in each, impurities collected in the channels are removed by straight cleaning tools while the channels are full of molten metal, and that each feature of the patents in suit was known to the art more than one year prior to the filing dates.

The court pointed out that a desirable feature is prevention of excessive turbulence but that every one of the prior art furnaces referred to minimize turbulence by maintaining the greatest possible depth of molten metal above the channel openings.

After pointing out other details, the court found that, on the prior art mentioned and certain other prior references in evidence, the patents do not embody any change or advance over the prior art constituting patentable invention and that both patents are invalid.

The trial court after considering all the evidence submitted in this respect, including the testimony of the expert witnesses and the prior patents, publications and uses, found that the idea of cleaning the channels while they were full of metal without interrupting the process was not new but was taught by the prior art. We have examined this prior art and the testimony and we are unable to say that the court's findings in this respect were clearly erroneous. There was adequate evidence we think to support the court's conclusions of fact that the prior art, if it had not taught actually the same thing, had suggested the solution to the problems confronting Tama. We think it would serve no good purpose to review in detail the evidence upon which

the court relied but shall refer somewhat briefly to some of the prior art references.

Plaintiff cited and depended largely upon public references to the Siemens furnace made in Germany, in various publications in this country. There is some variance in the interpretations of the apparatus by the various authors. The furnace is a conventional induction furnace of two chambers. We are interested only in the method provided for cleaning the channels. Some of the interpreters of the apparatus say that the channels are sloped or inclined and still others, that they are horizontal. However, it seems to us clear that there is a slight inclination or slope in the channels. The German furnace makers seem to adhere to the idea that it is better to clean the channels when they are empty rather than when full, and apparently Siemens adhered to that thought. But the court found that the channels could be cleaned while full and Tama, himself, testified that, if an opening was provided for cleaning the channels, completely in line with them, and a hole through the refractory wall of the furnace, then the tool could be inserted to clean while the metal is in the channels. Thus it appears that the only thing that Tama did was to tilt the channels somewhat more, as Wyatt had done, and provide the hole that he suggests through which cleaning tool might be inserted. Of course, some such provision was necessary, even if the channels were cleaned while empty. We think the court was fully justified in finding, on this and other evidence with regard to the Siemens furnace, that, under that evidence including the testimony of Tama, the provision of the hole was only the exercise of mechanical skill and that this addition to Siemens by Tama did not amount to patentable invention.

Essman, in Swedish patent 109,793, did not specify whether he intended that the channels be cleaned with the metal in them or while empty but, again, the slight adaptation or modification suggested by Tama, we think, was, as the court found, not patentable invention. We think also that the evidence adequately supports the court's finding that "the idea of cleaning the chan-

nels while full of molten metal is inherent" in this patent.

We shall not further extend discussion of the prior art; after careful consideration of all of it, we think that we are wholly unjustified in concluding that the court's findings were clearly erroneous. As we said in Hamilton Mfg. Co. v. Illinois Surgical Supply, 7 Cir., 193 F.2d 938, 942–943: "In any event, even if we entertained doubt, we would not be justified in refusing to accept the findings made by the District Court upon which its decision of invalidity rests."

Defendant relies also upon an alleged reduction of turbulence in the molten metal, as one of Tama's contributions. The parties agree that any molten bath of aluminum in a properly operated furnace inevitably develops a skin of oxide on its surface, which, if broken, results in serious trouble due to resulting oxidation. This tends to make the metal frothy and to develop hard spots in the castings. Apparently this problem was recognized by the workers in the art. But we do not find in the Tama patents any real suggestions upon this subject matter, any discussion of turbulence or any solution of its accompanying problems. We think the trial court properly found that Tama made no patentable contribution in this respect.

 Defendant complains of the exclusion of evidence of experiments by one Klein in attempting to utilize the early Wyatt patent, which, as we have observed, covered a furnace for melting brass, in melting aluminum. These experiments occurred from time to time over the years from 1930 to 1943. Defendant offered to prove that the witness would testify that in his attempts thus to adapt the Wyatt furnace successfully, he was unsuccessful. The furnace clogged or froze, and he was unable to devise a method of satisfactorily cleaning the channels. The evidence was offered on the theory that such objective experiments tend to rebut a finding that one skilled in the art could have achieved what the patentee accomplished.

Obviously, under certain circumstances, prior unsuccessful efforts to solve a prob-

lem are admissible for such purposes. However, in this particular instance, it is clear that the experimenter knew nothing of the German furnace, and it is not clear that he knew about other prior contributions to the art in evidence. Furthermore, there is no dispute that Wyatt did not teach how to build a proper induction furnace for melting aluminum. He was dealing with an entirely different metal possessing entirely different qualities. Defendant has made no claim that Wyatt's art was such as to instruct a furnace-maker how to melt aluminum. His contribution to the art preceded all attempts to build a furnace or prescribe a process for melting aluminum by an induction furnace. The proffered evidence, therefore, would have thrown no light upon the issue involved here. Furthermore, if we treat it as having been received and as having been considered by the court, it is wholly insufficient to rebut the documentary evidence before the court, a large part of which was wholly unknown to the witness. The error, if any, was wholly unprejudicial.

The judgment is affirmed.